IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

WAYNE KENNETH AUGE,

    Plaintiff,

vs.                                                                                       Civ. No. 14-1089 KG/SMV

STRYKER CORPORATION, and
HOWMEDICA OSTEONICS CORP.,

    Defendants.

MEMORANDUM OPINION AND ORDER

This matter comes before the Court upon Defendants' Motions for Summary Judgment, filed August 25, 2017. (Docs. 178, 179). Both motions are now fully briefed. (Docs. 186 and 192). Also before the Court are the parties' competing Motions to Strike certain portions of the summary judgment record, filed October 13, 2017 and October 17, 2017. (Docs. 193 and 196). Having considered all Motions, relevant undisputed evidence, and applicable law, the Court will grant the Motions as to Counts III, IV, and V of the Complaint. The Court will also grant summary judgment in Defendants' favor on Plaintiff's claim for breach of confidentiality agreement contained in Count I of the Complaint.

**I. Background and Uncontested Facts**[1]

This case arises from a contract dispute between Plaintiff, an orthopedic surgeon, and Defendants, medical device manufacturers. Around 1997, Plaintiff began developing devices and

---

[1] The facts are taken from the uncontested portions of the summary judgment record, which was construed in the light most favorable to Plaintiff.

techniques for use in orthopedic surgery, including a flexible drill system.[2] (Doc. 179) at 3; (Doc. 186) at 16. On February 29, 2000, Plaintiff and Defendant Stryker (individually, Defendant) executed a Confidentiality Agreement "to begin discussions [about] a possible business relationship" relating to the flexible drill system technologies. (Doc. 178-3) at 1; (Doc. 179) at 3; (Doc. 186) at 16. "The form such a relationship might take, whether one of contract, joint venture, formation of a business, investment, employment of [Plaintiff] by [Defendant], acquisition or otherwise," was then "unknown." (Doc. 178-3) at 1.

"In order for such discussions to be meaningful," Plaintiff agreed to "make available to [Defendant] certain highly confidential information," including:

> endoscopic technology; instruments; instrument designs; procedures; modifications of procedures; inventions and methods of treatment; … product design information; … and other information about [Plaintiff's] business and endoscopic inventions, designs, technology, and procedures not known to the public.

(Confidential Information) (Doc. 178-3) at 1. Defendant agreed not to disclose the Confidential Information to protect Plaintiff "against … improper use." *Id.*

The Confidentiality Agreement further provides:

> If [Defendant] … discovers, develops, makes, or manufactures any improvements to the Confidential Information (hereafter referred to as 'Improvements'), all such Improvements and all profits derived from the commercialization in any form of such Improvements, shall belong to and be the sole and exclusive property of [Plaintiff].

(Doc. 178-3) at 2.[3]

---

[2] Plaintiff placed his intellectual property in two entities, which later dissolved: MAP Technologies, LLC (MAP), and the Center of Orthopedic and Sports Performance Research, Inc. (COSPR). (Doc. 179) at 3; (Doc. 186) at 16. For simplicity and clarity, the Court will refer to the contracting parties as "Plaintiff" and "Defendant," even though the contracts also involved COSPR or a subsidiary/predecessor of Defendant Stryker.

[3] As a remedy for developing Improvements to Plaintiff's ideas, Defendant would be required to "assign to [Plaintiff] all intellectual property rights in any improvements it made to the designs and techniques he disclosed." *Id.* The Confidentiality Agreement also entitled Plaintiff to "injunctive relief as well as damages resulting from any violation by [Defendant] of the[] agreement." *Id.*

Between 2000 and 2007, the parties (or their predecessors/entities) executed three additional confidentiality agreements. (Doc. 179) at 4; (Doc. 186) at 16. The subsequent agreements each contain largely identical provisions as the February 2000, Confidentiality Agreement.[4] (Doc. 179) at 5; (Doc. 186) at 16. The Confidentiality Agreements are governed by New Mexico law. *Id.;* (Doc. 178-3) at 3.

In July 2009, after nine years of intermittent discussions, Plaintiff and Defendant executed an Assignment and Royalty Agreement (Royalty Agreement). (Doc. 178-5); (Doc. 186-1) at 3. Plaintiff assigned certain intellectual property rights to Defendant in exchange for royalty payments. (Doc. 178-5) at 1, 3. The Royalty Agreement provides:

> [Plaintiff] agrees to assign and hereby sells, assigns, transfers, and sets over unto [Defendant] … and assigns all of its right, title and interest in and to any Intellectual Property and commercial rights inventions whatsoever that were heretofore or during the term of this Agreement are conceived, made or developed by [Plaintiff] and that relate to the design, engineering or marketing of the Products.

(Doc. 178-5) at 2. Intellectual Property is a defined term that includes Patent Rights, Know-How, and Other Rights. (Doc. 178-5) at 1. Know-How includes "all inventions, confidential or proprietary ideas, … technical information or knowledge, … manufacturing methods … and other trade secrets relating to the Products." *Id.* It also includes any rights Plaintiff "hereafter conceives, makes, develops or reduces to practice or in which [Plaintiff] … may hereafter acquire any rights as such rights relate to Products." *Id.* The "Products" are defined as "the TwinLoop FLEX System identified in <u>Exhibit A</u>, attached hereto and made part hereof." (Doc. 178-5) at 2. Exhibit A identifies a series of drills, guides, and anchors. (Doc. 178-5) at 7.

In addition to the assignment, Plaintiff agreed to "consult and cooperate fully … with

---

[4] Together, the four agreements will be referred to as the "Confidentiality Agreements."

respect to potential … improvements to the Products." (Doc. 178-5) at 3. "No additional compensation [would] be paid" if Defendant accepted the improvements and incorporated them into the Products. *Id.* Plaintiff further agreed to assist Defendant in filing or prosecuting patent applications on any Intellectual Property incorporated in the Products. (Doc. 178-5) at 3. Finally, Plaintiff agreed not to assist in the development of any product that would compete "with the Products related to curved or flexible implant delivery systems" or perform consulting work "on the same or similar subject matter" as the Royalty Agreement. *Id.*

Defendant, in turn, agreed to "pay a one-time licensing fee [of $273,649.76] for exclusive rights to [Plaintiff's] technology related to flexible drill technology." (Doc. 178-5) at 3. The flexible drill technology included "prior patent submissions, engineering drawings, sketches, and prior disclosures." *Id.* Defendant also agreed to pay royalties (3% for instrumentation and 1.5% for implants) on the net worldwide sales of the Products. (Doc. 178-5) at 4.

The Royalty Agreement contains an intergration clause and a no-conflict clause. Section 13 provides: "This Agreement … constitute[s] the entire agreement between the Parties with respect to the subject matter…." (Doc. 178-5) at 5. Section 5 further provides: "[Plaintiff] represent[s] that there are no agreements in effect … that conflict with the rights granted by [Plaintiff] to [Defendant] hereunder or … with [Plaintiff's] obligations hereunder." (Doc. 178-5) at 3. The Royalty Agreement is governed by New Jersey law. (Doc. 178-5) at 6.

Defendant paid royalties as agreed on the TwinLoop FLEX device (TwinLoop). (Doc. 186) at 20. Defendant also obtained a patent on "[a]n apparatus for inserting a suture anchor into an internal anatomical site…." (Doc. 179-1).

After the Royalty Agreement was executed, Defendant developed a line of devices called Iconix. (Doc. 186-1) at 6-7. Defendant initially paid Plaintiff about $93,000 in royalties on the

4

Iconix devices between late 2012 and 2013. (Doc. 186-1) at 6. The parties also exchanged three draft amendments specifying that the Iconix devices were covered by the Royalty Agreement. (Doc. 186-1) at 48-58. The parties could not reach an agreement, and Defendant ceased paying royalties. (Doc. 186-1) at 6.

Defendants currently market and sell devices called Iconix, VersiTomic, and MicroFX. (Doc. 186-1) at 6-7. Those devices constitute Improvements to the confidential flexible drill technology disclosed pursuant to the Confidentiality Agreements. (Doc. 186-1) at 7; (Doc. 178-1) at 6.[5] VersiTomic was first advertised, marketed, and offered for commercial sale in March 2010. (Doc. 179) at 10; (Doc. 186) at 16. Aside from the initial $93,000 or so, Defendant has not paid Plaintiff royalties on the Iconix, VersiTomic, or MicroFX devices. (Doc. 186-1) at 6.

Plaintiff ceased practicing medicine in 2010. (Doc. 186-1) at 1. He currently works as a technical consultant for the trustee in the NuOrtho Surgical bankruptcy proceedings. (Doc. 179) at 2; (Doc. 186) at 16. Plaintiff formed NuOrtho in 2008 to develop medical technologies and market products. (Doc. 186-1) at 7. The bankruptcy docket reflects NuOrtho is not operating. *See* Bankr. No. 15-10476.[6] Plaintiff has not purchased or sold the Iconix, VersiTomic, or MicroFX products. (Doc. 179) at 9; (Doc. 186) at 16.

---

[5] This fact was taken from two documents. In his declaration, Plaintiff testified that "Stryker's Iconix, VersiTomic, and MicroFX devices all incorporate Improvements it made to my disclosures, rights that were secured to me in the Confidentiality Agreements we entered." (Doc. 186-1) at 7. In his deposition, Plaintiff testified:
> Q. If there were an improvement to your confidential information, you'd agree with me, wouldn't you, that the improvement would be related to flexible drill technology, right?
> A. It would be.

(Doc. 178-1) at 6.

[6] The NuOrtho bankruptcy was filed under Chapter 7, which requires liquidation, rather than under Chapter 11, which allows for the ongoing operation of a business. (Doc. 1) in Bankr. No. 15-10476. The docket further reflects that the Massachusetts Bankruptcy Court has not authorized any limited operation of the business in Chapter 7, as contemplated by 11 U.S.C. § 721.

On May 12, 2016, Plaintiff filed his First Amended Complaint for Breach of Contract (Complaint). (Doc. 34). Plaintiff contends the Iconix, VersiTomic, and MicroFX devices constitute "Improvements" as defined by the Confidentiality Agreements. (Doc. 186-1) at 7. Hence, he claims ownership of both devices and any profits therefrom. *Id.* If the Court disagrees, Plaintiff alternatively argues he is entitled to royalties on the Iconix, VersiTomic, and MicroFX devices. (Doc. 186-1) at 6. Plaintiff also asserts non-contract state law claims based on the theory that Defendant misappropriated his intellectual property. (Doc. 34).

By the instant Motions, Defendants seek summary judgment on all claims. (Docs. 178, 179). With respect to the contact claims, Defendants argue the Royalty Agreement superseded the Confidentiality Agreements, and that no additional royalties are due on the new devices. (Doc. 178). Defendants also seek summary judgment on Plaintiff's non-contract claims for: (1) unfair trade practices; (2) misappropriation of trade secrets; (3) unfair competition; (4) quantum meruit; and (5) unjust enrichment. (Doc. 179). Plaintiff opposes the summary judgment motions in their entirety. (Doc. 186).

**II. Standard of Review**

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013). The nonmovant may not rely upon mere allegations or denials contained in its pleadings or briefs and must instead show "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986). The Court views the facts in the light most favorable to the nonmoving party and draws all reasonable inferences in the nonmoving party's favor. *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013).

**III. Discussion**

    *A. Competing Motions to Strike*

The parties each filed a motion to strike portions of the other's summary judgment papers. (Docs. 193, 196). Defendants ask the Court to strike various facts from Plaintiff's statement of undisputed facts. (Doc. 193). They argue the facts contain argument or are not supported by admissible evidence. In response, Plaintiff moved to strike Defendants' motion to strike as an unauthorized surreply. (Doc. 194). He also asks the Court to strike Defendants' 22-page reply brief and the attached Appendices, which include charts comparing the various statements of undisputed facts and responses thereto.

For the most part, the dispute over fact statements and appendices is unnecessary. In evaluating a motion for summary judgment under Fed. R. Civ. P. 56, the Court does not accept every asserted fact statement in the briefs. Those statements are evaluated in light of the affidavits and exhibits that could be proffered in an admissible form at trial. *See Argo v. Blue Cross Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (holding Rule 56 permits consideration of evidence that could be presented at trial). Each fact listed above, for example, is based on the contracts, deposition transcripts, and affidavit testimony. The Court only accepted testimony where it was based on facts, rather than legal conclusions, and where it was uncontroverted by other evidence in the record. *See Clemmons v. Bohannon,* 956 F.2d 1523, 1528 (10th Cir. 1992) (noting summary judgment affidavits must contain *specific facts,* not conclusions). Therefore, the Court denies both Motions and declines to strike any portion of the

summary judgment record. The Court will also overlook filings that exceed page limitations, as both parties filed combined responses and replies to the two summary judgment motions.

### *B. Count I: Breach of Confidentiality Agreements*

The claim for breach of the Confidentiality Agreements turns on whether Defendant purchased the TwinLoop, or all confidential flexible drill technology, under the Royalty Agreement. Plaintiff argues the Royalty Agreement only pertains to the TwinLoop device. (Doc. 186) at 30-33. He contends the Confidentiality Agreements remain in effect as to all other flexible drill technology, and he therefore owns the Iconix, VersiTomic, and MicroFX devices because they constitute "Improvements" to his technology. *Id.* Defendants argue the Royalty Agreement supersedes the Confidentiality Agreements. (Doc. 178) at 17. Alternatively, and at the very least, Defendants argue Plaintiff cannot enforce the Confidentiality Agreements with respect to any confidential flexible drill technology. (Doc. 192) at 12.

The parties agree that New Jersey law governs the question of whether, and to what extent, the Royalty Agreement supersedes the earlier Confidentiality Agreements. (Doc. 178) at 17; (Doc. 186) at 31. Under New Jersey law, "[t]he general rule is that a subsequent contract covering the same subject matter and made by the same parties, but containing [inconsistent] terms, … rescinds, supersedes and substitutes for the earlier contract and becomes the only agreement on the part of the parties on the subject matter." *Kant v. Seton Hall Univ*., 2008 WL 65159, * 7 (D.N.J. Jan. 4, 2008) (quoting *Rosenberg v. D. Kaltman & Co*., 28 N.J.Super. 459, 101 A.2d 94, 96 (Ch. Div. 1953)). *See also Vescom Structures, Inc. v. Engineered Framing Systems, Inc.,* 2005 WL 3196581, *3 (App. Div. Nov. 30, 2005) (acknowledging *Rosenberg* still supplies the standard). In other words, "[t]he terms of the second contract must be so inconsistent with those of the former contract that they cannot stand together." *Rosenberg*, 28 101 A.2d at 96.

Courts look to the plain language of the contracts to determine whether the parties intended to replace an earlier agreement. *Rosenberg*, 101 A.2d at 96. The presence of an integration or "entire agreement" clause is relevant to the analysis. *See, e.g., Brauser Real Estate, LLC v. Meecorp Capital Markets, LLC,* 2008 WL 324402, at *9 (D.N.J. Feb.4, 2008) (noting entire-agreement clause tends to "establish the intent of the parties that the writing shall be an integration of their agreement") (quoting Williston on Contracts § 33:21 (4th ed.) (2007)). Another important factor is whether the contacts address overlapping subject matter. *See, e.g., Mangone v. Mangone,* 202 N.J. Super. 505, 495 A.2d 496 (Ch. Div. 1985) (analyzing whether marriage contract and cohabitation agreement cover same subject matter).[7]

If the meaning and intent of the competing contracts cannot be discerned from their plain language, parol evidence may be admitted. *Chance v. McCann*, 405 N.J. Super. 547, 563–64, 966 A.2d 29 (App. Div. 2009). However, the evidence can only be used "for the purpose of interpreting the writing[s]" and "not for the purpose of modifying or enlarging or curtailing [their] terms." *Id.* (quoting *Atlantic Northern Airlines, Inc. v. Schwimmer*, 12 N.J. 293, 301-02, 96 A.2d 652 (1953)). Relevant extrinsic facts include: "the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain[.]" *Lederman v. Prudential Life Ins. Co. of Am., Inc*., 385 N.J. Super. 324, 339, 897 A.2d 373 (App. Div. 2006).

Applying these principles, the Court finds that the Royalty Agreement did not entirely supersede the Confidentiality Agreements. The earlier contracts protected any and all confidential information Plaintiff disclosed to Defendant. By its express terms, the Royalty

---

[7] *See also Vescom Structures,* 2005 WL 3196581, *3 (focusing on whether later contract is inconsistent with earlier agreement); *Winans v. Asbury Park Nat. Bank & Trust Co.,* 13 N.J. Super. 577, 582, 81 A.2d 33 (Ch. Div. 1951) ("The general rule is that an executed contract which covers the whole subject matter embraced in a prior one between the same parties rescinds the prior agreement").

9

Agreement only pertains to a subset of that information. The integration clause states that the Royalty Agreement represents the parties' entire agreement "with respect to [the] subject matter" of the agreement. (Doc. 178-5) at 5 (emphasis added).

The Court is not convinced, however, that the TwinLoop system is the only confidential "subject matter" Plaintiff sold. The Royalty Agreement was not limited to one tangible product. Defendants purchased technical know-how, ideas, and confidential information as well as all patent rights to a "flexible drill, guide, and anchor system." (Doc. 178-5) at 1-2. Defendants are permitted to use any know-how from the TwinLoop to develop improvements to that product. (Doc. 178-5) at 3. The royalty provisions also reflect that Plaintiff granted Defendants the "exclusive rights" to, and a license on, any "prior disclosures" of his "flexible drill technology." *Id.* Read as whole, the Royalty Agreement permitted Defendants to use confidential information pertaining to all flexible drill technology, not just the TwinLoop system.

This conclusion is based on the plain language of the Royalty Agreement. Nevertheless, consideration of parol evidence would yield the same result. Plaintiff's February 2017, deposition testimony states that "confidential information … about [his] flexible drill system" was "part of the assignment" to Defendants. (Doc. 192-3) at 6. He further testified that "[t]he flexible drilling system" constitutes the "products and techniques that giving rise to the rights and interests in this case." *Id.* at 4. Plaintiff's September 2017, declaration asserting the Royalty Agreement only covered the flexible drill technology incorporated in the TwinLoop devices is insufficient to create a fact issue on that point. (Doc. 186-1) at 3. *See also Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 973 (10th Cir. 2001).[8]

---

[8] *Ralston* sets forth three factors to consider when deciding whether to disregard an affidavit that contradicts earlier deposition testimony: (1) whether the affiant was cross-examined during his earlier

For the foregoing reasons, the Court concludes the Royalty Agreement supersedes the Confidentiality Agreements, in part. Those Agreements do not prohibit Defendants from manufacturing Improvements to Plaintiff's flexible drill technology, including the Iconix, VersiTomic, and MicroFX devices. Hence, the Court will grant summary judgment on Plaintiff's claims for breach of the Confidentiality Agreements.

### C. Count I: Breach of Royalty Agreement

Plaintiff alternatively asserts Defendants should have paid royalties on the Iconix, VersiTomic, and MicroFX devices. (Doc. 186) at 34. Defendants disagree, and now argue their obligations under the Royalty Agreement are limited to the TwinLoop devices. (Doc. 192) at 10. Defendants point to Section 9(b), which requires them to pay royalties on the Products. (Doc. 178-5) at 4. "Product" is defined as the "TwinLoop ... System." *Id.* at 2. Thus, Defendants contend they purchased all of Plaintiff's flexible drill technology, but they only have to pay royalties on one product.

New Jersey law dictates that "contracts should be read as a whole in a fair and common sense manner." *Manahawkin Convalescent v. O'Neill*, 217 N.J. 99, 118, 85 A.3d 947 (2014) (quoting *Hardy ex rel. Dowdell v. Abdul–Matin*, 198 N.J. 95, 103, 965 A.2d 1165 (2009)). The terms "should not be read in isolation and should not be used to 'twist and distort their obvious meaning in the minds of the parties.'" *Warren v. Birchwood Adult Day Care, L.L.C.,* 2015 WL 3998859, * 4 (N.J. App. Div. July 2, 2015) (quoting *Atlantic Northern Airlines, Inc. v.*

---

testimony; (2) whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence; and (3) whether the earlier testimony reflects confusion which the affidavit attempts to explain. 275 F.3d at 973. Here, Plaintiff was an adverse witness during the deposition. The affidavit does not include any newly discovered evidence. Further, the record reflects no confusion. Plaintiff is a highly sophisticated doctor who understands the finer technological distinctions better than anyone in this case.

*Schwimmer*, 12 N.J. 293, 301-02, 96 A.2d 652 (1953)).

As discussed above, a comprehensive, fair, and common sense reading of the Royalty Agreement is that Defendants' rights are broader than just the Confidential Information in the TwinLoop. In so ruling, the Court specifically declined to read the definition of "Products" in isolation, and instead focused on the royalty provision relating to all "flexible drill technology." Ignoring that provision now would require the Court to revisit its earlier ruling. Hence, Defendants have not established that the Royalty Agreement forecloses royalties on other products incorporating Plaintiff's flexible drill technology.[9] Defendants' summary judgment motion on Plaintiff's claim for breach of the Royalty Agreement will be denied.

### *D. Count II: Claim for Breach of the Obligation of Good Faith and Fair Dealing*

It is not entirely clear whether Planitiff's claim for breach of the obligation of good faith and fair dealing is governed by New Mexico or New Jersey law. In any event, the standard is the same in both states. (Doc. 178) at 24; (Doc. 196) at 35, n. 21. A "good faith and fair dealing" claim requires proof of a bad motive or intentional wrongdoing. *See Badiali v. N.J. Mfrs. Ins. Grp.,* 220 N.J. 544, 554 (2015) ("Proof of bad motive or intention is vital to an action for breach of good faith."); *Ruegsegger v. Western NM University Bd. of Regents,* 2007-NMCA-030, ¶ 39, 154 P.3d 681 (holding contract rights must be "violated in an intentional way or with bad faith"). The Court has yet to adjudicate breach, and there is no evidence in the record regarding motive or intent. Hence, the Court declines to enter summary judgment on Plaintiff's claim for breach of the obligation of good faith and fair dealing.

---

[9] Although resorting to parol evidence is unnecessary, such evidence supports this construction. The undisputed evidence shows that Defendants initially believed they owed royalties on the Iconix devices. (Doc. 186-1) at 6. The parties also exchanged three draft amendments stating that the Iconix devices were covered by the Royalty Agreement. (Doc. 186-1) at 48-58.

### E. Count IV: Claims for Violation of the New Mexico Unfair Trade Practices Act

New Mexico's Unfair Trade Practices Act (UTPA) prohibits "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce." "Consistent with its purpose as consumer protection legislation," New Mexico courts have found "the UPA gives standing only to buyers of goods and services." *Hicks v. Eller,* 2012-NMCA-061, ¶ 20, 280 P.3d 304. *See also Santa Fe Custom Shutters & Doors, Inc. v. Home Depot U.S.A., Inc*., 2005-NMCA-051, ¶ 17, 113 P.3d 347 (same).

It is undisputed that Plaintiff is not a consumer of Defendants' products. To resist summary judgment, he relies on *First Nat. Bancorp Inc. v. Alley,* 76 F.Supp.3d 1261 (D.N.M. 2014). That case extended UTPA standing to competitors. Even if the Court were to adopt *First Nat. Bancorp,* the evidence shows that Plaintiff is not currently selling medical devices. The same is true of his bankrupt entity, NuOrtho. Further, there is no authority conferring competitor standing based on a possibility that the plaintiff "would have been able to market products," absent the alleged wrongdoing. (Doc. 186-1) at 8. Defendants are entitled to summary judgment on Plaintiff's UTPA claim.

### F. Count V: Claims for Misappropriation of Trade Secrets

"A plaintiff's entitlement to damages for the misappropriation of the plaintiff's trade secret is governed by the Uniform Trade Secrets Act, which is codified at NMSA 1978, §§ 57-3A-1," et. seq. (UTSA). *Rapid Temps, Inc. v. Lamon,* 2008-NMCA-122, ¶ 20, 192 P.3d 799. A trade secret includes information or techniques that derive value from not being generally known or ascertainable. *Id.* (quoting NMSA § 57-3A-2(D)(1)). Misappropriation is defined as, inter

13

alia, the use of a trade secret without consent. *Id.* (quoting NMSA § 57-3A-2(B)(2)).[10]

Plaintiff claims Defendants inappropriately incorporated his trade secrets in the Iconix, VersiTomic, and MicroFX devices. However, the Court found that Defendants purchased the rights to Plaintiff's flexible drill technology, including the Iconix, VersiTomic, and MicroFX devices. Their use of the technology is therefore not "without consent." Defendants are entitled to summary judgment on Plaintiff's claim for misappropriated his trade secrets.[11]

### G. Counts VI & VII: Claims for Quantum Meruit and Unjust Enrichment

To prevail on a claim for unjust enrichment, "one must show that: (1) another has been knowingly benefitted at one's expense (2) in a manner such that allowance of the other to retain the benefit would be unjust." *Ontiveros Insulation Co. v. Sanchez*, 2000-NMCA-051, ¶ 11, 129 N.M. 200, 3 P.3d 695. Quantum meruit enables a plaintiff to recover the reasonable value of services rendered. *See Matter of Venie,* 2017-NMSC-018, ¶ 34 395 P.3d 516. These equitable remedies typically "may only be invoked in the absence of an express contract or when grossly inequitable circumstances require it." *Arena Resources, Inc. v. Obo, Inc.,* 2010-NMCA-061, ¶ 16, 238 P.3d 357. Grossly inequitable circumstances include "fraud, real hardship, oppression, mistake, unconscionable results, and the other grounds of righteousness, justice and morality." *Id.* The Court cannot determine if the circumstances here are inequitable, and the parties' contract rights have yet to be defined. Therefore, the summary judgment motion will be denied

---

[10] The other types of misappropriation (surreptitious or improper acquisition) are not relevant here. *See* NMSA § 57-3A-2(B).

[11] The Complaint alleges Defendants "misappropriated [Plaintiff's] trade secrets" by incorporating the secrets "in their product lines, including but not limited to those named TwinLoopFlex, Iconix, VersiTomic, and MicroFX...." (Doc. 34) at 13. The Court finds it is appropriate to dismiss Count V entirely, as this lawsuit does not involve any distinct trade secrets. However, the ruling is limited to the confidential flexible drill technology and the TwinLoopFlex, Iconix, VersiTomic, and MicroFX products. The ruling does not prejudice Plaintiff's right to sue for misappropriation of trade secrets if Defendants, their successors, or assigns misappropriate an unrelated technology.

with respect to Plaintiff's claims for unjust enrichment and quantum meruit.

> ### H.  Count III: Claims for Common Law Unfair Practices, Unfair Competition, Deceptive Marketing, and Wrongful Exploitation of Trade Values

The remaining claims at issue appear in Count III of the Complaint.  Count III is labelled "Common Law Unfair Practices and Unfair Competition," and "Deceptive Marketing and Wrongful Exploitation of Trade Values."  (Doc. 34) at 10.  The claims are grounded in the Restatement of the Law (Third) of Unfair Competition.  Under the Restatement, a defendant is liable for "causing harm to the commercial relations of another by engaging in a business or trade" through:

> (1) deceptive marketing…;
> (2) infringement of trademarks and other indicia of identification…;
> (3) appropriation of intangible trade values including trade secrets and the right of publicity…; [or]
> [4] from other acts or practices … determined to be actionable as an unfair method of competition, taking into account the nature of the conduct and its likely effect on both the person seeking relief and the public.

Restatement (Third) of Unfair Competition § 1 (1995).

Here, Defendants did not misappropriate any trade secrets.  The Court is also not convinced Defendants engaged in unfair trade practices or competition, as Plaintiff is not a competitor.  That leaves Plaintiff's deceptive marketing claim.  To be liable for deceptive marketing, the defendant must make "a representation relating to [its] own goods, services, or commercial activities that is likely to deceive or mislead prospective purchasers to the likely commercial detriment of another."  Restatement (Third) of Unfair Competition § 2 (1995).

Plaintiff has not satisfied the "commercial detriment" element of the test.  "A representation is to the likely commercial detriment of another if … it is likely to cause a diversion of trade from the other or harm to the other's reputation or good will."  Restatement

15

(Third) of Unfair Competition § 3 (1995). Plaintiff does not sell medical devices. Further, a breach of the Royalty Agreement would not implicate Plaintiff's reputation or brand in the medical device business. He sold his technology and know-how under the Royalty Agreement so that Defendants could develop and market products under their own name. Hence, Defendants are entitled to summary judgment on Plaintiff's common law claims for unfair practices, unfair competition, deceptive marketing, and exploitation of trade secrets.

**IV. Conclusion**

Viewing the evidence in the light most favorable to Plaintiff, the Court will deny summary judgment as to Plaintiff's claims for breach of the Royalty Agreement contained in (Count 1); breach of the obligation of good faith and fair dealing (Count II); Count VI (quantum meruit); and Count VII (unjust enrichment). The Court will grant summary judgment in Defendant's favor on all remaining claims.

IT IS ORDERED that

1. Both Motions to Strike (Docs. 193, 196) are denied.

2. Defendants Motions for Summary Judgment (Docs. 178, 179) are granted, in part, and denied in part.

3. Plaintiff's claims for breach of the Confidentiality Agreements contained in Count 1, and Counts III, IV, and V of the Complaint, are dismissed with prejudice, and judgment will be entered.

_____
UNITED STATES DISTRICT JUDGE